It is hereby

ORDERED that the Order set forth below is
hereby signed as an order of the court to be entered
by the clerk.

Signed: January 10, 2005.



_____
S. Martin Teel, Jr.
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

In re                          )
                               )
CAPITOL HILL GROUP,            )     Case No. 02-00359
                               )     (Chapter 11)
                Debtor.        )

DECISION REGARDING CROSS-MOTIONS FOR SUMMARY JUDGMENT
ON CAPITOL HILL GROUP'S OBJECTION TO NEWMARK'S CLAIM

Newmark of Washington D.C. LLC, d/b/a Newmark & Bank

Company ("Newmark") has filed a claim against the Debtor in

this case in the amount of $454,025 (proof of claim no. 7),

which Newmark alleges it earned as commissions in connection

with real estate and consulting services Newmark and its

predecessor-in-interest provided to the debtor.  For ease of

discussion, the court will refer to Newmark's predecessor-in-

interest and Newmark collectively as "Newmark" throughout this

opinion.  The debtor objects to Newmark's claim, and has moved

for summary judgment, declaratory judgment, and partial

summary judgment in connection with said claim.  Newmark has

objected to those motions and filed two cross-motions for

summary judgment.

As explained in more detail below, Newmark's claim to a commission from the debtor is barred by D.C. Code § 42-1705, which precludes real estate agents from collecting brokerage commissions in the absence of a written listing agreement. Newmark has failed to satisfy this statutory requirement, and the court will grant summary judgment in the debtor's favor on that basis, but with leave for Newmark to prove a claim based on hourly-based compensation.

I

The undisputed facts is this case are as follows.

There are two parcels of real estate at issue in this dispute (collectively, "the Properties"), both of which belonged to the debtor when the events in question took place. There is the "Town House Land" located on 7th Street, N.E., Washington, D.C., which the Debtor sold to the Holladay Corporation ("Holladay") pursuant to a December 8, 2000 purchase and sale agreement, and there is the "Apartment Building Land," consisting of the land and improvements located at 700 Constitution Avenue, N.E., Washington, D.C., which remains the debtor's property.

In January 2000, after Holladay made an offer to purchase the Properties, Dr. Shin (the debtor's principal)

sought to employ Newmark to provide valuation services and assist the debtor in maximizing economic return on the Properties.  Newmark subsequently "helped research, review, and negotiate a contract dated March 24, 2000, in which Holladay agreed to purchase part of the Property."  Bank Decl. ¶ 7.  Three days later, in a letter dated March 27, 2000 ("March 2000 Letter"), Newmark provided the debtor with an overview of the commission and hourly fee agreement allegedly governing the relationship between Newmark and the debtor.

In the March 2000 Letter, Newmark set forth the proposed terms and conditions under which it would "perform real estate brokerage and sales services" on the debtor's behalf "in connection with the sale of 700 Constitution Avenue, N.E. [meaning the Apartment Building Land]."  The letter was sent to Dr. Shin by electronic facsimile transmission on March 27, 2000.  Under the terms of the letter, the debtor was to pay Newmark an advance retainer of $1,500, and would pay Newmark representatives their "current hourly rates," which the letter states as "$125 for Laurence Bank and Lisa Benjamin, $100 for their associates, and generally lower rates for services rendered by other assistants."  The letter indicates that the fees would "generally be based upon the amount of time spent by [Newmark's] real estate professionals and support staff on

[the debtor's] behalf and certain expenses incurred by

[Newmark] that are allocable to that representation."

Newmark, in turn, would provide detailed invoices, generally

on a monthly basis, payment of which would be expected within

30 days after services were rendered.

     Finally, the March 2000 Letter provides that, in addition

to an hourly fee, Newmark is entitled to a commission of one

percent of the purchase price of 700 Constitution Avenue, N.E.

(the Apartment Building Land) in the event the property is

sold during the term of the agreement, or to any purchaser who

is identified during or within two years after the agreement's

termination.  Newmark's letter does not identify a termination

date for the supposed agreement, nor does it purport to

distinguish between services to be performed in exchange for

the hourly fee and services to be performed in exchange for

the commission.

     Finally, the letter provides that "[i]f the arrangements

set forth above are agreeable, please acknowledge your

understanding thereof and agreement thereto by having the

enclosed two (2) copies of this letter dated and executed in

the space provided below and returning one executed copy

thereof to us."  The debtor never signed or returned an

executed copy of the letter to Newmark and no retainer was

4

ever paid.  Although Newmark claims that this letter memorialized a pre-existing oral agreement between Newmark and the debtor, the debtor denies the existence of any oral agreement to pay a commission.  The debtor does, however, concede the existence of an oral agreement to pay Newmark on an hourly fee basis.[1]

By a letter dated September 29, 2000 ("September 2000 Letter"), Newmark purported to amend "the earlier consulting and commission agreement dated March 27, 2000, regarding the sale and development of Capitol Hill Hospital [a reference intended to mean the Properties]."  The "earlier agreement" to which the September 2000 Letter refers is the March 2000 Letter described above, which Newmark concedes the debtor never signed.

In describing the services Newmark would provide, the September 2000 Letter indicates that Newmark would be "[a]dvising [the debtor] on the disposition of this property, and will to [sic] provide unbiased, strategic advice as you continue to analyze your various options."  According to

---

[1]  Debtor's Objection to Claim at 3 (D.E. No. 205, filed November 28, 2002) ("The Debtor, however, understood that Newmark had agreed to provide valuation services on an hourly basis.  The Debtor paid, and Newmark accepted, payments on an hourly basis in connection with such services subsequent to the March 2000 Letter.").

5

Newmark, this letter memorializes an oral agreement that Dr.
Shin and Mr. Banks (Newmark's representative) arrived at
during a round of golf.  The debtor denies the existence of
such an oral agreement.[2]

In the September 2000 letter, Newmark indicates that it
is to receive a 1% commission on Square 865 and Square 895
(the Town House Land), in accordance with the March 27
"agreement."  The September 2000 letter further purports to
amend that earlier "agreement" by granting Newmark a 3%
commission on the sale of lot 76 (the Apartment Building
Land), while also terminating the hourly fee structure
described in the March 2000 Letter.  As with the March 2000
Letter, the September 2000 Letter provides that "[i]f the
arrangements set forth above are agreeable, please acknowledge
your understanding thereof and agreement thereto by having the
enclosed two (2) copies of this letter dated and executed in
the space provided below and returning one executed copy
thereof to us."  The debtor never signed nor returned an
executed copy of the letter to Newmark.

The only invoice that Newmark provided to the debtor was

_____

[2]  Objection to Claim at 3-4 (DE No. 205, filed November
28, 2002) ("The Debtor never discussed the payment of
commission to Newmark in connection with the sale of the
Apartment Building Land and the Town House Land.")

dated April 6, 2000, and was for seven hours of service at an
hourly rate of $125.00.  The debtor paid the invoice on April
26, 2000.  No further invoices were sent and no further
payments were made.

The debtor entered into a purchase and sale agreement
with Holladay dated December 8, 2000, which provides that the
debtor is to sell the Apartment Building Land and the Town
House Land to Holladay.  The Town House Land was sold to
Holladay pursuant to that agreement for $3,000,000.  Newmark
has claimed a 1% commission on that sale price, or $30,0000
plus interest.  The Apartment Building Land, which the debtor
agreed to sell to Holladay for $13,300,000, was never sold.
Although Holladay and the debtor no longer intend to go
forward with the sale, Newmark still asserts a claim for a 3%
commission on the sale price, or $399,000 plus interest or, in
the alternative, rejection damages on the theory that Newmark
was a third party beneficiary to the sales contract and it was
the debtor's own wrongdoing that prevented the sale from going
forward.

Each of the two purchase and sale agreements signed by
the debtor and Holladay (March 24, 2000, and December 8, 2000,
respectively) included a provision that "Seller [Capitol Hill
Group] has used the services of The Bank Companies (Newmark's

7

predecessor-in-interest) and Seller shall be solely
responsible for paying the fees and commissions owed to the
Bank Companies, pursuant to a separate written agreement."
Newmark was not a party to either of those purchase and sale
agreements.[3]

On February 20, 2001, Mr. Banks sent a letter to Dr. Shin
in which he describes Newmark's involvement in the sale of the
Properties, and reasserts his position that Newmark is
entitled to commissions on the sale of the Properties.  In a
March 1, 2001 letter from Dr. Shin to Mr. Banks, Dr. Shin
denies that he ever agreed to pay Newmark a percentage-based
commission on behalf of the debtor in connection with the sale
of the Properties.

On August 2, 2001, Newmark brought an action for breach
of contract and quantum meruit against the debtor in the
Superior Court for the District of Columbia to recover the
commissions that are the subject of these cross-motions for
summary judgment.   In the jurisdictional allegation of its
Superior Court complaint, Newmark represents that the "lawsuit
involves brokerage services performed in connection with the

---

[3]  The first of Newmark's two "agreement" letters was not
even sent to the debtor until March 27, 2000, three days after
the March 24, 2000 purchase and sale agreement referencing a
separate written agreement was executed.

sale of property in the District of Columbia...."

II

**A.    D.C. Code § 42-1705 precludes Newmark from seeking a
commission without a written listing agreement.**

Until 1981, real estate brokers were permitted under the
common law of the District of Columbia to rely on equitable
theories such as quantum meruit to collect commissions in the
absence of a written contract.  D.C. Code § 45-1945 was
enacted in 1981 and provided that "A written listing contract
is required in the District for the sale of all real
property."  Notwithstanding the statute's express requirement
that there be a written listing contract for the sale of real
property, courts continued to permit real estate agents to
advance equitable theories to collect their commissions.  The
rationale behind such decisions was that the statute had not
expressly changed the common law, and pre-existing common law
therefore remained binding precedent.  See Cassidy & Pinkard,
Inc. v. Jemal, 899 F. Supp 5, 8 (D.D.C. 1995), quoting Dell v.
Dept. of Employment Services, 499 A.2d 102, 107 (D.C. 1985)
("no statute is to be construed as altering the common law,
farther than its words express.").  At least one court
explained that this result could have been avoided, and the
common law changed, if the statute had expressly provided that
"no commission shall be payable on a contract for the sale of

9

real estate in the absence of a written listing contract."
Id. at *7.

The statute was amended in 1997 and now provides that "A
written listing contract is required in the District for the
sale of all real property.  A licensee **shall not** receive
payment of a commission in the absence of a written listing
agreement." D.C. Code § 42-1705 (emphasis added).  The court
concludes that this express prohibition against payment of
commissions in the absence of a written listing agreement
overrules prior case law that permitted brokers to collect
commissions on equitable theories such as quantum meruit.
Accordingly, Newmark's claim to a commission is barred in the
absence of a written listing agreement.

**B.    Newmark seeks its commission in exchange for real estate
        brokerage services it provided to the debtor.**

Newmark argues that, even if D.C. Code § 42-1705 changed
the common law, Newmark's services and corresponding claim to
commissions are not governed by D.C. Code § 42-1705 because
the services Newmark performed for the debtor, and for which
it claims to have earned commissions, are not the type of
services typically addressed in a listing agreement.
Specifically, Newmark emphasizes that it did not propose to,
nor did it in fact, procure a buyer for the property, and in
its September 2000 Letter, Newmark expressly characterized its

"agreement" with the debtor as a consulting and commission agreement.

The court first observes that the services Newmark proposed to provide or did provide to the debtor are typical brokerage services, not just consulting services. Indeed, there is ample evidence in the record, most of which was authored by Newmark and Mr. Banks, that what Newmark proposed to do for the debtor was serve as a real estate broker in connection with the sale of the Properties.

In its March 2000 Letter, for example, <u>Newmark</u> characterized the services it would perform for the debtor as "real estate brokerage and sales services." In the September 2000 letter, Newmark purports to amend the terms set forth in the March 2000 letter, and in doing so refers to the terms of the March 2000 letter as a "Consulting and Commission Agreement." Although Newmark's September 2000 letter adopts different terminology to describe its services, it does not purport to negate or retract its earlier representation that it intended to, and was in fact, performing real estate and sales services. Although Newmark may have performed or intended to perform some services for the debtor that do not qualify as traditional real estate brokerage services governed by D.C. Code § 42-1705, Newmark was at least in part providing

11

real estate brokerage services.

Moreover, even assuming that one aspect of Newmark's service to the debtor was in fact pure consultation rather than brokerage services, there is nothing in the record showing that Newmark sought its commission _only_ in return for such non-brokerage services.  Because the alleged contract (whether this be the alleged oral agreement, or the alleged oral agreement as memorialized in Newmark's March 2000 and September 2000 letters) is not severable along those lines, D.C. Code § 42-1705 governs the entirety of services provided or proposed to be provided by Newmark to the debtor.  See Rugh v. Soleim, 92 Or. 329, 335, 180 P. 930, 932 (1919), overruled on other grounds ("The contract stated, however, is not a severable one.  It is for a lump sum without reference to the separate value of any particular item, and hence, as it includes services within the statute of frauds, the whole stipulation is void and cannot be enforced as such . . . . It would be an evasion of the statute if a real estate broker, assuming to act under oral appointment to negotiate a sale of land, should be allowed to tack his claim for that service to another demand for drawing a deed and make the latter the device by which he could recover on an agreement which the law says is void unless it is embodied in a writing containing

certain prescribed terms.").

Newmark also argues that because it was not and never proposed to be a procuring broker, its services would not have properly been addressed in a listing agreement.  In support of this argument, Newmark directs the court's attention to the definition of "written listing contract" found in D.C. Code § 42-1702, which provides that "[t]he term 'written listing contract' means a contract between a broker and an owner in which the owner grants to the broker the right to find a purchaser for a designated property at the price and terms the owner agrees to accept, and the broker, for a fee, commission, or other valuable consideration, promises to make a reasonable effort to obtain a purchaser for the term of the contract." Thus, argues Newmark, because it did not propose to find a buyer for the property, its entitlement to a commission did not require a written listing agreement as provided for in § 42-1705 (which term Newmark urges the court to use interchangeably with the term listing contract, as defined in § 42-1702).  Newmark's argument is a matter of semantics.  Its entitlement to each commission was contingent on a sale being completed which necessarily would entail a purchaser having been obtained: a sale, in other words, is the obtaining of a purchaser, and completion of the sale was the contingency for

13

Newmark's being entitled to the commissions.

Moreover, D.C. Code § 42-1705 provides that "a licensee **shall not** receive payment of a commission in the absence of a written listing agreement." (Emphasis added).  It does not limit its application only to those licensees who agree to procure a buyer, nor does it carve out an exception for licensees whose predominant role with respect to the sale of property is consultation and contract negotiation rather than actual procurement of a buyer.  Accordingly, the court rejects Newmark's argument that the statute is inapplicable to Newmark's services.[4]

The court also observes that if Newmark's argument had merit, the resulting disparate application of the statute would create the very type of uncertainty and invite the very type of fraud the statute was presumably enacted to prevent. Indeed, under Newmark's proposed interpretation of the statute, a real estate broker who plays a role in the sale of property and later seeks a commission could avoid the effects

---

[4]  The statute's language is mandatory, and it either requires every licensee seeking a commission in connection with the sale of real property to have a written listing agreement, or precludes those licensees who are not providing services that could be addressed in a written listing agreement from seeking a commission.  In either case, the statute precludes Newmark from collecting a commission under these facts.

14

of D.C. Code § 42-1705's written listing agreement requirement by simply failing to find a buyer, and instead offering the post hoc rationalization that it was really just providing commissionable consulting, not brokerage, services. By contrast, a broker who actually procured a buyer, but did not have the necessary written listing agreement, would have no recourse even if that broker could demonstrate the existence of an oral understanding between the broker and seller. The court does not believe the legislature intended such a result. Accordingly, the court will read § 42-1705 broadly as applying not only to brokers who procure buyers, but also to brokers who seek commissions in exchange for other standard brokerage services designed to facilitate a sale such as sale negotiations and contract finalization.

Furthermore, although the terms proposed by Newmark's letters do not expressly grant Newmark permission to procure a buyer in exchange for a commission (which Newmark suggests is necessary for an agreement to be a "listing" agreement), the proposed terms in fact go <u>well beyond</u> such permission by purporting to grant to Newmark an exclusive right to sell. Indeed, if the debtor had agreed to Newmark's proposed terms, the debtor would have signed away its right to sell its property (on its own or through the services of another

15

broker) free and clear of any liability to Newmark for a period of over two years beyond the termination of the alleged agreement.  In fact, the letter agreements purport to entitle Newmark to a commission in the event the property is sold to any buyer that was identified during the two years following termination of the contract.  Thus, although Newmark may not have been agreeing to procure a buyer in exchange for a commission, it did seek to limit the debtor's right to hire another broker to perform such services unless the debtor was willing to pay two brokerage commissions.  See Brown v. Miller, 45 Ill. App.3d 970, 360 N.E.2d 585 (1977) (agreeing to pay broker's commission if broker procures the buyer or if the property is sold prior to termination of the contract by the seller, broker, or any other broker, gives rise to an exclusive right to sell contract).

If sellers need the protection of D.C. Code § 42-1705 to prevent procuring brokers from coming out of the woodwork and seeking commissions that were never agreed to by the seller, certainly sellers are in equal, if not greater, need of the statute's protection from brokers who fraudulently seek commissions predicated on an exclusive right to sell.[5]

---

[5]  Property owners are not lightly deemed to have surrendered such rights.  23 Williston on Contracts, Contracts with Brokers § 62:20 (4th ed. 2004) ("An exclusive right to

16

Finally, notwithstanding Newmark's argument that it was not a procuring broker, the record reflects that Newmark <u>did</u>, in fact, solicit at least one prospective buyer and pursued other purchasers for the debtor's property.  <u>See</u> Capitol Hill Group's Supplement to Debtor's First Motion for Summary Judgment (D.E. No. 369, filed May 29, 2003) (Exh. 3.) February 20, 2001 Letter from Banks to Shin ("We solicited competitive bids for the North Tower [meaning the Apartment Building Land] ....");  <u>Id.</u> (Exh. 4.) September 13, 2000 Letter from Andrew Montelli, Fairfield Residential Companies to Dr. Shin ("Ms. Lisa Benjamin of Newmark and Bank has informed us there is a possibility your Capitol Hill Hospital site [meaning the Properties] may become available.  Should this happen, Fairfield Residential would be interested in pursuing this property at market price.").  Thus, even when viewing the evidence in the light most favorable to Newmark, and even if the court were to accept Newmark's argument that only

---

sell may be created only by clear and unambiguous language, since the owner of property should not lightly be held to have surrendered the right to sell his or her own property unless that right is expressly negated by the contract."); <u>Bourgoin v. Fortier</u>, 310 A.2d 618, 620 (Me. 1973) ("[O]ne seeking to create an exclusive right to sell, in which the owner may not sell his property without paying the broker whether or not the broker procured the buyer, must do so in an express and unambiguous manner within the four corners of the contract.").

procuring brokers are bound by D.C. Code § 42-1705, there can
be no question that Newmark did, at least in part, perform
procurement services for the debtor and now seeks commissions
in connection with those services.

It may be that Newmark devoted much of its efforts to
consulting, advising and negotiating, and comparatively little
time seeking competitive bids or other purchasers, but the
bottom line is that Newmark, by its own admission, performed
real estate brokerage services for the debtor, including
procurement services, and is now seeking commissions in
connection with those services.

There has also been a suggestion in the motion papers
that what Newmark seeks by its claim is not a "commission"
within the meaning of the statute, but rather an alternative
fee arrangement for consulting services.  The court rejects
this argument.  Newmark seeks a percentage of the property's
sale price as compensation for the real estate brokerage and
consulting services it provided in connection with the sale of
that property.  Under the plain meaning of the word
commission, and its meaning under the statute, what Newmark
seeks is without doubt a commission.

**C.**  **Newmark has failed to demonstrate the existence of a
written listing agreement between the debtor and Newmark.**

The debtor never signed or returned Newmark's March 2000

and September 2000 letters, nor did the parties enter into any
other written agreement purporting to govern their
relationship.  Although there are circumstances under which
courts may find acceptance by silence, this is not such a
case.  Indeed, Newmark's March 2000 and September 2000 letters
expressly call for the debtor to sign and return the letters.
It would, as a matter of law, be unreasonable for Newmark to
assume that the debtor had assented to the agreement by
silence, when by Newmark's own terms acceptance was to be
expressed by a signed executed copy returned to Newmark.

**D.   Even when viewed collectively, Newmark's letters and the
purchase and sale agreements fail to satisfy the written
listing agreement requirement of D.C. Code § 42-1705.**

In its opposition to the debtor's objection to claim
(D.E. No. 241, filed October 26, 2002), Newmark argues that,
just as a party can satisfy the statute of frauds' writing
requirement by reference to several documents, a party can
satisfy the written listing agreement requirement of D.C. Code
§ 42-1705 by piecing together several writings if one of the
writings is signed and the writings in the circumstances
clearly indicate that they relate to the same transaction. See
Clay v. Hanson, 536 A.2d 1097, 1100 (D.C. 1988)(quoting
Restatement (Second) of Contracts § 132 (1981)).

The debtor, on the other hand, asserts that the provision

19

in the sales agreements referencing a separate written
agreement between the debtor and Newmark has no bearing on the
analysis.  First, Newmark is not a party to the purchase
agreements.  Second, a reference in the purchase agreements to
a separate written agreement between Newmark and the debtor
does not obviate the need for Newmark to demonstrate that a
separate written agreement actually exists before it takes on
heightened significance within the context of the sales
agreements.

The purchase agreements, whether viewed independently or
in conjunction with Newmark's letters, do not satisfy the
writing requirement of D.C. Code § 42-1705.  First, the law is
clear that the purchase agreements, to which Newmark is not
even a party, do not constitute a written agreement between
Newmark and the debtor.  See Hursey Porter & Associates v.
Bounds, 1994 WL 762670, *10 (Del. Super. December 2, 1994)
(unpublished decision) (reference in sales contract to
seller's obligation to pay third-party brokerage fee does not
constitute a listing agreement); Bensen v. Gall, 605 A.2d 841,
158 Vt. 106, 111 (1992) (sales agreement containing essential
terms of the commission contract did not cure absence of a
written listing agreement); id. at 112 (finding that the
language in the sales agreement referencing the broker's

commission was largely boilerplate, and observing that if such language were deemed enforceable notwithstanding the absence of a written listing agreement, it would "eliminate a major incentive for [brokers] to comply with the rule."); New England Investment Properties, Inc. v. Spire Realty and Development Corp., 31 Conn. App. 682,685, 626 A.2d 1316 (1993) (holding that to satisfy Connecticut's statute requiring a written listing agreement "the agreement must be in effect at the time the broker's services are rendered.").

Furthermore, even if D.C. Code § 42-1705 could be satisfied by reference to multiple documents, as is the case under the statute of frauds, the two letters and the sales agreements, when read together, still fail to constitute a written listing agreement.[6]  Newmark was not a party to the

---

[6]  Without deciding the issue, the court accepts for purposes of this opinion Newmark's contention that the written listing agreement requirement of D.C. Code § 42-1705 can be satisfied by reference to multiple documents.  That said, the court has serious doubts as to whether the statute actually permits brokers to satisfy the statute in this fashion. Indeed, although D.C. Code § 42-1705 may resemble the statute of frauds insofar as it requires a writing to evidence an agreement, § 42-1705 addresses a very specific type of contractual arrangement and it would be incorrect to assume that exceptions available under the statute of frauds or nuances in that statute's application or enforcement are available under D.C. Code § 42-1705.  See Stella v. Wilmington Savings Fund Society, 1993 WL 138697, * 11 (Del. Super. March 30, 1993) (unpublished opinion) (finding that unlike regulation governing brokers' commissions of which no real estate broker can be blamelessly ignorant, the statute of

sales agreements and the circumstances strongly suggest that
the language was included in the sales agreements to allocate
burdens between the buyer and seller, not to create rights in
Newmark.  All of these circumstances support the debtor's
position that the references to Newmark in the purchase and
sales agreements are insufficient to overcome Newmark's
failure to obtain the debtor's signature on the March 2000 and
September 2000 letter agreements.

E.      **Newmark's equitable theories are unavailing**.

Newmark argues that the debtor's fraud is responsible for
the non-existence of a writing between the parties, and the
debtor is thus equitably estopped from pleading D.C. Code §
42-1705.  Newmark's position is that because the debtor
received the letters in which the terms of compensation were
set forth, and continued to permit Newmark to perform services
on behalf of the debtor, the onus was on the debtor to
repudiate those terms if it found them unacceptable.
Likewise, Newmark argues that it did not press for return of
the signed letters because the debtor expressly acknowledged
the existence of the agreement in the Holladay sales
agreement.  Thus, the debtor is barred by the doctrine of

_____

frauds is designed to protect both sophisticated parties and
unrepresented laymen).

promissory estoppel from relying on D.C. Code § 42-1705 to
avoid payment of a commission to Newmark.

By its own admission Newmark was aware that the letters
had not been signed and returned by the debtor, and it was
Newmark who took a gamble by not "pressing" the issue with the
debtor.  Newmark is presumed to be a sophisticated party,
aware of the risk it assumes by operating pursuant to a
supposed "understanding" that has not been memorialized in a
signed contract, especially when governing law requires a
written contract to make such an agreement enforceable.
Accordingly, the court rejects Newmark's equitable and
promissory estoppel arguments.

Newmark also argues that by signing the Holladay sales
agreements, which expressly reference a separate written
agreement between the debtor and Newmark, the debtor has
waived the right to plead D.C. Code § 42-1705.  In response,
the debtor argues that equitable theories cannot be used to
circumvent the requirements of § 42-2705.  Given the mandatory
language of the statute, and the fact that Newmark was not
even a party to the sales agreement upon which Newmark relies
to establish waiver, the court rejects Newmark's waiver
argument.

**F.   Newmark cannot recover a commission based on quantum
       meruit but may be entitled to hourly compensation under**

23

**an express oral contract**.

Newmark argues that in the event its claim to a commission fails, it is nonetheless entitled to the value of its services under the doctrine of quantum meruit.  As explained above, D.C. Code § 42-1705 overrules prior common law that would have permitted Newmark to proceed under that theory.  Notwithstanding D.C. Code § 42-1705's prohibition with respect to commissions, the statute does not preclude Newmark from entering into oral agreements for hourly-based compensation.  Even if the hourly-based compensation could be viewed as a commission within the meaning of D.C. Code § 42-1705, the statute is satisfied here because the debtor has admitted the terms of the hourly-based compensation agreement, thereby agreeing to those terms.[7]  <u>See</u> Debtor's Objection to

---

[7]  The debtor also admitted the existence of an oral agreement to pay Newmark on an hourly basis during the February 11, 2003 hearing on these motions.  <u>See</u> February 11, 2003 Hearing, Tr. at 4 ("Well, Your Honor, we're not saying that they're not entitled to anything.  If you look at their proof of claim, their proof of claim is based entirely on commission.  We don't dispute that Dr. Shin did pay for one invoice for valuation services provided on an hourly basis.  Dr. Shin agreed only to pay for services on an hourly basis, real estate evaluation services.  We've never disputed that fact.  We've never received any additional invoices for these hourly services from Newmark, and pending viewing those statements and provided that they're reasonable for the services that they did, which we allege, Your Honor, were not insignificant but also not significant in terms of amount and volume.  Your Honor, we've never disputed that we would pay for hourly valuation services."); Tr. at 48 ("Their proof of

Newmark's Claim (D.E. No. 205, filed November 25, 2002) (Exh.

D) March 1, 2001 Letter from Shin to Bank ("I have

consistently and steadfastly told you that your firm will be

engaged as real estate advisors and will be paid on an hourly

basis.  You agreed, submitted hourly bills, and CHG paid

them.").  The statute ought not preclude a written offer and a

written acknowledgment as constituting a written agreement.[8]

III

In its motion for declaratory judgment and partial

summary judgment (D.E. No. 337, filed May 7, 2003), the debtor

_____

claim is based a hundred percent on commission.  As we've
said, we are prepared to pay, upon looking at invoices – –
which we've never received; we've asked for them, we just
don't have them – – we're prepared to pay invoices for hourly
services.").  In light of these admissions, and given the
undisputed evidence that Newmark performed services for the
debtor, that the debtor accepted those services, and that the
debtor on at least one occasion assented to a bill for those
services at the rate of $125 per hour, the court finds that
there was, at the very least, an oral agreement between the
parties for the debtor to compensate Newmark for its services
at $125 an hour.

[8]  Newmark has argued that the <u>value</u> of its services far
exceeds the hourly figures under which it agreed to perform
services for the debtor.  Although the court appreciates that
Newmark would prefer to recover on a quantum meruit basis –
relying on its expert testimony to establish the level of
commission it should have received for the services it
rendered to the debtor – that avenue of recovery is not
available to Newmark.  Indeed, if the court were to accept
that measure of recovery, it would be the equivalent of
awarding Newmark the commission that D.C. law says Newmark is
not entitled to recover.

advances an alternative basis for denying Newmark any
commission with respect to the Apartment Building Land.  The
debtor argues that because the Apartment Building Land has not
and will not be sold to Holladay, either because the sales
agreement has expired or has been rejected, the court should
declare that Newmark's claim to a commission based on the sale
of the Apartment Building Land be disallowed.  Newmark, on the
other hand, claims that it is a third-party beneficiary of the
Purchase Agreement, and would therefore be entitled to
rejection damages (assuming that it was the debtor's fault
that the sale did not go forward), making summary judgment in
the debtor's favor inappropriate.  Newmark further asserts
that the doctrine of prevention precludes the debtor from
taking advantage of its own breach of contract.  Finally,
Newmark argues that the debtor's failure to assert the grounds
set forth in its motion for declaratory judgment sooner
precludes the debtor from doing so now.

        Newmark's third-party beneficiary argument is
unavailing.  Although the District of Columbia recognizes that
a purchase agreement to which a real estate broker is not a
party may create enforceable rights in the broker as a third-
party beneficiary, see Moran v. Audette, 217 A.2d 654 (D.C.
1966), Newmark cannot assert such rights if it cannot also

26

demonstrate an independent right to a commission that was triggered or otherwise implicated by the Purchase Agreement. Because the court has concluded that, as a matter of law, Newmark has no enforceable claim to a commission in connection with the sale of the debtor's property, it likewise has no standing to assert third-party beneficiary rights under the Purchase Agreement in the event the sale does not go forward.

The same reasoning precludes Newmark from recovering under the prevention doctrine. In support of its prevention doctrine argument, Newmark cites to a line of cases holding that a broker remains entitled to his commission if it is the seller's misconduct or fault that a sale is not consummated, unless the seller expressly retains the right to avoid the broker's commission under such circumstances. This argument, however, assumes an underlying right to a commission, a right that Newmark has failed to establish. As such, Newmark's reliance on the doctrine of prevention is misplaced.

IV

For the foregoing reasons, the court will grant debtor's original motion for summary judgment. However, because both parties concede the existence of an oral agreement for the debtor to compensate Newmark on an hourly basis, the court will deem Newmark's claim amended to reflect this basis of

27

recovery, with a trial on the amended claim being all that remains of this dispute.

Because the court has already determined that summary judgment in favor of the debtor on debtor's first motion for summary judgment is appropriate, and for the reasons stated above, the debtor's motion for declaratory judgment and partial summary judgment is hereby denied as moot.  Likewise, Newmark's first and second motions for summary judgment are denied.

*[signature appears above]*
S. Martin Teel, Jr.
United States Bankruptcy Judge

Copies to:

Office of the U.S. Trustee
115 South Union Street
Suite 210
Alexandria, VA 22314

Patrick Potter
Shaw Pittman LLP
2300 N Street, NW
Washington, DC 20037

Donald R. Hartman
700 Constitution Avenue, N.E.
Washington, DC 20002

Christopher B. Mead
Mark London
London & Mead
1225 19th Street, NW, Suite 320
Washington, D.C. 20036